IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

CECIL RAY NICHOLAS     )
             )
v.             )   No. 2:08-0017
             )   Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

    This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 16), and defendant's cross-motion for judgment on the pleadings (Docket Entry No. 21).[1] Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 13), and for the reasons given below, the undersigned recommends that plaintiff's motion be **GRANTED**; that defendant's motion be **DENIED**; and that defendant's decision be **REVERSED** and the cause **REMANDED** for further administrative proceedings consistent with this report, to include rehearing.

_____

[1]Counsel for defendant is reminded of the terms of the court's scheduling order (Docket Entry No. 15), which direct the filing of a brief in response to plaintiff's motion for judgment on the administrative record. The framing of the government's response to a plaintiff's arguments as a separate motion for judgment only clutters the case docket.

Case 2:08-cv-00017   Document 23   Filed 02/20/09   Page 1 of 21 PageID #: 70

# I. Introduction

Plaintiff filed his DIB application on June 14, 2004, alleging disability beginning June 1, 2002, due to emphysema, high blood pressure, allergies, stomach problems, skin cancer, and depression (Tr. 51-54, 57). Following an examination of his earnings between June 2002 and May 2004 (Tr. 79), plaintiff amended his alleged onset date to May 16, 2004 (Tr. 45-48). Plaintiff's claim to benefits was denied by the state agency which initially reviews such claims (Tr. 31-32, 35-37), and was denied again by that agency upon reconsideration (Tr. 33-34, 39-40). Plaintiff thereafter requested a *de novo* hearing before an Administrative Law Judge ("ALJ") with the federal agency's Office of Hearings and Appeals (Tr. 29). Plaintiff's case was heard on December 6, 2006, when plaintiff appeared with counsel and gave testimony (Tr. 713-28). Testimony was also received from an impartial vocational expert (Tr. 728-33). At the conclusion of the hearing, the ALJ took the case under advisement, until May 24, 2007, when he issued a written decision denying plaintiff's claim to benefits (Tr. 13-20). The ALJ's decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since May 16, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: chronic obstructive pulmonary disease, hypertension, history of skin cancer, degenerative joint disease in the neck, and status post right shoulder surgery (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, lifting twenty pounds occasionally and ten pounds frequently, sitting for up to two hours in an eight-hour day, and standing and/or walking for six hours in an eight-hour day; occasionally climbing, stooping, bending from the waist to the floor, crouching, crawling, avoiding excessive exposure to sunlight, environmental pollutants, avoiding reaching overhead with the right upper extremity.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on August 12, 1955 and was 48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 16, 2004 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 15, 18-20)

          On January 3, 2008, the SSA's Appeals Council denied plaintiff's request for

review of the ALJ's decision (Tr. 5-7), thereby rendering that decision the final decision of

3

the Administration.  This civil action was thereafter timely filed, and the court has

jurisdiction.  42 U.S.C. § 405(g).  If the ALJ's findings are supported by substantial evidence,

based on the record as a whole, then those findings are conclusive.  Id.


## II.  Review of the Record

The following record review is taken from defendant's memorandum (Docket

Entry No. 22 at 3-9), with slight modification by the undersigned.

### A.  Hearing Testimony and Other Evidence

Plaintiff was born in December 1955, making him 51 years old at the time of

the ALJ's decision (Tr. 18, 73, 715-16).  Plaintiff has a high school education (Tr. 18, 62, 716)

and had past relevant work as a dump truck and back hoe operator, superintendent for a

roofing company and lumber salesperson (Tr. 18, 58-59, 64-67, 76-79, 90-93, 716-18).  In

describing his complaints, plaintiff claimed that he could only walk approximately one-to-

two blocks; stand for only 10 to 15 minutes at a time or 45 minutes a day; sit for about 4

hours; and pick up 15-20 pounds (Tr. 81, 123).  In terms of activities of daily living, plaintiff

cared for his personal needs, did light housework, prepared simple meals, did laundry, drove,

shopped, paid bills, visited with friends and relatives, talked on the telephone, read, and

watched television (Tr. 80-81, 84-87, 116, 123-25).  Plaintiff lived alone (Tr. 125).  An

impartial vocational expert ("VE") testified at the hearing on December 6, 2006 (Tr. 713-33).

The VE was asked in a hypothetical question, to consider the availability of work for an

individual of plaintiff's age, education, and past work experience, who was limited to light

4

work,[2] with sitting for up to two out of eight hours in a day and standing/walking for six out of eight hours in a day; occasional climbing, stooping, bending from the waist to the floor, crouching and crawling, avoiding excessive overhead reaching with the right upper extremity, and avoiding exposure to sunlight and environmental pollutants (Tr. 15, 729-33). In response, the VE noted that such an individual could perform light level jobs such as: sorter (3,710 locally/133,174 nationally); cashier II (20,218 locally/908,387 nationally); and marker (retail trade) (4,450 locally/167,533 nationally).  (Tr. 729-731)

B.  Medical Evidence

From 2001-2004, dermatologist Dr. Michael Gold evaluated, treated and removed plaintiff's multiple skin growths, numbering over 500 (Tr. 158-300, 304-22, 327-33).  The lesions were generally identified as actinic keratosis[3] and removed.  Id.  The pathology reports confirmed that some of the lesions contained squamous cell carcinoma.[4]

In 2002, plaintiff experienced chest and epigastric pain (Tr. 135-36, 137-39). Testing was negative for cardiac ischemia and positive for H. Pylori (Tr. 135-36).  Chest x-rays showed minimal changes (Tr. 135-36), the ECG and gallbladder ultrasounds were normal (Tr. 140, 143) and the double contrast upper GE showed probable generalized gastritis (Tr. 141).  In April 2003, plaintiff complained of fatigue and weakness (Tr. 380).  CT

_____

[2]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  20 C.F.R. § 404.1567.

[3]Skin growths caused by excessive exposure to the sun.  Dorland's Illustrated Medical Dictionary (Dorland's), 975 (30th ed. 2003).

[4]A malignant growth which is initially found to be local and superficial.  Dorland's at 295.

5

scans of the head and chest were normal (Tr. 527-528). The scan of the abdomen showed

bilateral renal cysts and was otherwise normal. (Id.) The cardiac Doppler, stress test and

vascular ultrasound were also normal (Tr. 529, 541, 544-45). Plaintiff had multiple diagnoses

of allergy and sinusitis based upon symptoms of sinus congestion, no energy and head

hurting (Tr. 377, 379). Sinus x-rays were normal (Tr. 526). At the end of 2003, plaintiff

again complained of chest tightness, cough and headache (Tr. 375). The chest x-ray showed

a normal size heart with evidence of COPD (Tr. 525). Plaintiff was advised to stop smoking

(Tr. 375).

In 2004, plaintiff continued to experience sinus congestion and was diagnosed

with sinusitis (Tr. 373, 374). Sinus x-rays showed congestion (Tr. 524) and the MRI of the

head was essentially normal (Tr. 523). In March 2004, plaintiff complained of stomach pain

and being slightly depressed (Tr. 372). In May, following successful laparoscopic gallbladder

surgery, plaintiff was advised to resume all activities (Tr. 148-55). Plaintiff continued to

cough and was diagnosed with acute bronchitis, COPD and depression (Tr. 370). The CT

scan of the abdomen showed bilateral renal cysts, the CT scan of the neck was normal and

the CT scan of the chest showed no tumors (Tr. 521). In July, plaintiff complained of right

arm and shoulder pain and received a steroid injection (Tr. 371). On August 11, 2004, Dr.

Allred, plaintiff's treating physician, opined that plaintiff did not have an underlying mental

disorder that would significantly interfere with functioning, that he was capable of managing

his own funds and he had normal and full range of motion (ROM) throughout with minor

reduction in the shoulder (Tr. 358-360A). On exam, plaintiff reported shoulder pain with no

improvement and blood pressure that was elevated but improved (Tr. 369). The MRI of the

right shoulder showed no rotator cuff tear with possibly some tendinitis secondary to

6

impingement (Tr. 520).

In late October, prior to plaintiff's scheduled rotator cuff repair, plaintiff presented to the emergency room with complaints of chest pain and shortness of breath (Tr. 336-38). On exam, his breathing was regular, even and non-labored, his motor strength was full (5/5), he had full range of motion and normal chest x-rays (Tr. 336-38, 519). Additional chest x-rays showed no evidence of acute pulmonary disease (Tr. 342, 343), sinus x-rays showed no evidence of sinusitis (Tr. 518) and the ECG showed a nonspecific abnormal sinus bradycardia (Tr. 341). A few days later, plaintiff reported doing well with some intermittent chest pain (Tr. 366). A stress test was negative (Tr. 355).

The November spirometry report indicated mild to moderate restriction in air flow (Tr. 432-35). In early December, plaintiff was admitted with questionable pneumonia and treated for bronchitis and sinusitis (Tr. 344, 632-33). Chest x-rays showed no evidence of acute lung disease (Tr. 352) and a normal heart size (Tr. 512), sinus x-rays were normal (Tr. 353) and x-rays of the abdomen and pelvis were unremarkable (Tr. 651,661).

On December 8, 2004, a Disability Determination Services physician completed a medical analysis based upon a full review of the medical evidence of record and found that plaintiff's physical impairments were not severe (Tr. 356). The physician noted that plaintiff's COPD, blood pressure, allergies, skin cancers, GERD and cholesterol were non-severe and did not have a combined physical effect. Id. The physician further noted that pain was not an issue since he had a single complaint of shoulder pain which also did not establish it as a severe impairment. Id.

At the end of December, plaintiff returned to Dr. Allred and was again diagnosed with acute bronchitis and COPD (Tr. 365). The chest x-ray showed a mild

7

increase in heart size and no gross area of infiltrates (Tr. 510). The following week Dr. Allred opined that plaintiff was doing a little better, his physical exam was negative and noted his white count was still elevated (Tr. 361).

Three months later, plaintiff again had the same complaints with normal chest x-rays and a normal sinus rhythm (Tr. 601, 622). On March 13, 2005, plaintiff was admitted for right shoulder impingement syndrome and repair (Tr. 605-10). On exam, he was noted to be in stable medical condition, he exhibited some weakness against resistance and had no motor weakness (Tr. 605). Post-operatively plaintiff developed some chest pain which was relieved by medication (Tr. 607, 611). The chest x-rays and cardiology work-up were normal and he was released home (Tr. 611-612). In April 2005, plaintiff complained of a cough and congestion and had no other symptoms; testing was again normal. (Tr. 699)

On April 26, 2005, a Disability Determination Services physician conducted a residual functional capacity ("RFC") assessment based upon a full review of the medical evidence of record and found that, by December 2005, plaintiff would be capable of occasionally lifting and carrying 50 pounds, frequently lifting and carrying 25 pounds, standing, walking and sitting for a total of six out of eight hours in a workday with limited right upper extremity reaching, mildly limited postural activity, and the need to avoid fumes, odors, dusts, and poor ventilation (Tr. 546-51). The physician cited to the medical record to support his findings and noted that there had been no acute treatment for COPD, and that plaintiff's pain was expected to improve and resolve with continued and appropriate medical therapy (Tr. 550-51).

Dr. Allred opined in May 2005 that plaintiff had improved overall from his last visit, when his sinusitis and bronchitis were acute (Tr. 689, 690). In the beginning of June,

8

plaintiff was again diagnosed with acute sinusitis and bronchitis (Tr. 688). Two weeks later plaintiff complained of bad headaches that started in his neck (Tr. 687-88). On exam, he had definite neck tenderness and decreased range of motion, and was diagnosed with neck pain, inflammatory arthritis and chronic headaches. (Id.) The cervical spine x-ray showed no acute abnormalities, though there was evidence of probable early degenerative disc change at C6-C7 with perhaps some foraminal narrowing in the lower cervical area (Tr. 698). In July, August, September and October, plaintiff continued to complain of sinus congestion and drainage (Tr. 684-86, 694).

Following a fall through his porch in September 2005, plaintiff complained of left leg pain (Tr. 591-598) and was admitted and treated in the emergency room for cellulitis of the leg (Tr. 574-87). X-rays indicated soft tissue swelling (Tr. 598). Dr. Allred later opined that plaintiff's leg had improved (Tr. 683).

From February through September 2006, plaintiff returned to Dr. Allred on a monthly basis for medication refills (Tr. 681-83) and had multiple diagnoses of bronchitis and sinusitis (Tr. 682). In early September, plaintiff was brought to the emergency room following a motor vehicle accident with complaints of chest pain (Tr. 560, 566). On exam he had normal behavior, was able to ambulate independently, could perform all activities of daily living, had full 5/5 motor strength and his respiratory effort was unlabored (Tr. 560). Chest x-rays showed no evidence of cardiopulmonary disease or rib fracture (Tr. 567). The following month plaintiff still complained that his chest hurt (Tr. 692). The chest x-ray showed some signs of COPD and scarring but no findings of acute infiltrates (Tr. 692). A follow-up bone scan was essentially normal and was consistent for possible left rib fractures (Tr. 558).

9

On December 1, 2006, Dr. Allred completed a Medical Assessment of Ability to do Work-Related Activities form and indicated that plaintiff: could occasionally lift 20 pounds; could stand/walk for 2 hours and sit for 3 hours; could occasionally perform postural activities; had decreased physical function in reaching, handling, feeling and pushing/pulling, and had decreased ability to be around moving machinery, temperature extremes, chemicals, dust, humidity, vibration and fumes (Tr. 678-80).

The following month, on January 21, 2007, Dr. Michael Cox conducted a consultative evaluation at the request of the DDS (Tr. 701-05) and completed a Medical Source Statement of Ability to do Work Related Activities (Tr. 706-09). In his report, Dr. Cox found, based upon his examination and plaintiff's objective medical findings, that plaintiff could frequently lift 10 pounds and occasionally lift up to 20-25 pounds, stand/walk for six out of eight hours per day, sit and push/pull without issue and that he had no postural limitations at the time (Tr. 704, 706). Dr. Cox further found that plaintiff could reach, handle, finger and feel, as well as communicate, without restriction (Tr. 704, 708). Finally, Dr. Cox found that plaintiff should limit his exposure to temperature extremes, dust, humidity, wetness, fumes, odors and chemicals to a total of two out of eight hours a day, due to his COPD (Tr. 704, 709).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d

10

124, 125 (6ᵗʰ Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6ᵗʰ Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6ᵗʰ Cir. 1994)).  Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6ᵗʰ Cir. 1999).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.

11

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, at *4); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined

12

effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

## C.  Plaintiff's Statement of Errors

Plaintiff alleges multiple errors in the ALJ's analysis of the medical evidence, primarily contending that the opinion of his treating physician, Dr. Allred, should have been found to be sufficiently supported by the objective medical record to outweigh the opinion of the one-time examining consultant, Dr. Cox.  Additionally, plaintiff contends that the ALJ failed to give proper consideration to the rate of absenteeism which would result from his symptoms and the frequent procedures he underwent for removal of potentially cancerous skin lesions, arguing that his inability to perform work on a "regular and continuing basis" is thus precluded.[5]  For the reasons that follow, the undersigned concludes that plaintiff's arguments have merit, and that remand for further administrative attention to this case is in order.

Given Dr. Allred's status as a treating physician, great weight and deference would generally be due his opinions as to the nature and severity of plaintiff's medical conditions and resulting limitations.  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th

---

[5]See Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *2 (defining "residual functional capacity" in terms of maximum activity sustainable on a regular and continuing basis; "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

Case 2:08-cv-00017   Document 23   Filed 02/20/09   Page 13 of 21 PageID #: 82

Cir. 2007). Indeed, when a treating physician's opinion is sufficiently supported and not

substantially opposed, it is entitled to controlling weight. 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2). Even when such opinions are not controlling, "in all cases there remains a

presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to

great deference ..." Rogers, 486 F.3d at 242. "The treating physician doctrine is based on the

assumption that a medical professional who has dealt with a claimant and his maladies over a

long period of time will have a deeper insight into the medical condition of the claimant

than will a person who has examined a claimant but once, or who has only seen the

claimant's medical records." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994). This

deferential standard is prescribed by regulation, as recognized by the Sixth Circuit:

> This court has frequently recognized that where "the opinion of a treating
> source is not accorded controlling weight, an ALJ *must* apply certain factors ...
> in determining what weight to give the opinion." *Wilson* [*v. Comm'r of Soc.
> Sec.*], 378 F.3d at 544 (emphasis added). Specifically, § 404.1527(d) of the
> SSA's regulations prescribes that the ALJ is to consider (1) the length of the
> treatment relationship and the frequency of examination, (2) the nature and
> extent of the treatment relationship, (3) the supportability of the opinion, (4)
> the consistency of the opinion with the record as a whole, and (5) the
> specialization of the treating source. 20 C.F.R. § 404.1527(d). The regulation
> further assures claimants that "[w]e will always give good reasons in our notice
> of determination or decision for the weight we give your treating source's
> opinion." 20 C.F.R. § 404.1527(d)(2). ... This court held in *Wilson* that,
> because § 1527(d)(2) provides claimants with an "important procedural
> safeguard," the SSA was not free to relax or disregard the rule in an ad hoc
> fashion. 378 F.3d at 547.

Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 747 (6th Cir. 2007).

14

In this case, Dr. Allred has submitted a medical source statement of plaintiff's work-related limitations, in which he opines that plaintiff is exertionally limited to lifting 20 pounds occasionally, standing and/or walking for a total of 2 out of 8 hours (30 minutes at a time), and sitting for 3 to 4 hours out of 8, all on account of the multiple diagnoses plaintiff carries: "COPD, malaise, irritable bowel syndrome, inflammatory arthritis, GERD, allergic rhinitis, chronic leukocytosis, multiple skin cancers, hyperlipidemia, hypertension, and depression." (Tr. 17, 678-80) While Dr. Allred did not delineate among plaintiff's conditions in assigning responsibility for the limitations assessed, it appears from the record that plaintiff primarily struggles with his level of fatigue, his breathing problems, and his head and neck pain.

Plaintiff has consistently claimed before the agency that he suffers a debilitating level of fatigue (Tr. 57, 80-81, 119, 720), though he states that his physicians have not been able to identify a cause for such fatigue. (Tr. 721-22) Plaintiff does not appear to suffer daytime somnolence, as he admits that he does not require naps (Tr. 80). While Dr. Allred has noted that plaintiff also experiences malaise,[6] his fatigue with exertion appears to be attributable in large part to his COPD and related feeling of "smothering." (Tr. 57, 728) The ALJ offered the following analysis of plaintiff's breathing difficulties:

_____

[6]Malaise is "an indefinite feeling of debility of lack of health often indicative of or accompanying the onset of an illness." http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=malaise.

15

Dr. Allred referred the claimant to an allergist who indicated that pulmonary function testing at rest was normal in 1997. The claimant was thought to have upper respiratory allergies. Allergy shots and smoking cessation were recommended.[7] The claimant was diagnosed with acute bronchitis in December of 2004, April, June, and July of 2005 and July and September of 2006. The claimant's symptoms responded to treatment. Chest x-ray reportedly "may show some findings of COPD." He was also treated for sinusitis which resolved with treatment. He was hospitalized for pneumonia in December of 2004 (Exhibit 5F). His pulmonary function studies confirmed response to bronchodilator. The undersigned finds that the claimant's lung condition precludes excessive exposure to environmental pollutants but does not prohibit him from engaging in light exertion.

(Tr. 17)

The extent of plaintiff's alleged shortness of breath, such that even walking across the room (Tr. 57) or showering and shaving (Tr. 728) causes him trouble, simply has not been corroborated by the medical record to date. The chest films of record (e.g., Tr. 352, 525, 692) confirm the COPD diagnosis, as recognized by the ALJ, but neither the films nor the results on clinical examination support the severity of impairment alleged by plaintiff. In addition, an October 2004 pulmonary function test resulted in the interpretation of plaintiff's pre-medication function as moderately restricted, and his function after medication with a bronchodilator was only mildly restricted (Tr. 432).

However, as referenced above, Dr. Allred's assessment (Tr. 678-80) does not indicate which of plaintiff's multiple impairments contribute to which assessments of functional limitation. In dealing with this assessment, the ALJ reasoned simply that "Dr. Allred's notes do not support limitations to the degree he reported." (Tr. 17) He then

_____

[7]As of the date of the hearing, plaintiff had ceased smoking cigarettes, but continued to smoke a pipe against medical advice (Tr. 718-19).

16

discussed in turn each of the medically determinable ailments and symptoms for which Dr. Allred and others provided treatment, beginning with plaintiff's COPD and ending with his subjective complaints of weakness and fatigue, noting the less-than-disabling character of each along the way (Tr. 17-18). The ALJ further observed that Dr. Allred's treatment notes do not document chronic complaints of malaise, and that the complaints of pain, weakness, fatigue, and dizziness are not supported by objective findings (Tr. 18).

This analysis resulted in the ALJ's apparent agreement with Dr. Allred that plaintiff had limited ability to withstand exposure to environmental irritants due to his pulmonary impairment; a lifting limitation of 20 pounds on an occasional basis due to arthritic changes in his cervical spine and difficulties with his right shoulder; a limitation to only occasional postural activities; and, a limitation against overhead reaching with the right arm due to residuals of his shoulder surgery. However, with respect to Dr. Allred's assessment of limitations on standing/walking for more than 2 hours, as well as limitations on handling, feeling, and pushing/pulling, the ALJ rejected Dr. Allred's assessment in favor of the consultative examiner, Dr. Cox.[8] The ALJ accorded "great weight" to the opinion of Dr. Cox (Tr. 18), though he rejected without explanation Dr. Cox's opinion that plaintiff could sit without restriction,[9] and had no postural or reaching restrictions. However, Dr.

_____

[8]Based on his examination of plaintiff, Dr. Cox opined, *inter alia*, that plaintiff's capacity for standing and/or walking would be limited to 6 hours out of an 8-hour workday, and his capacity for pushing, pulling, and other manipulative activities would be unlimited. (Tr. 704)

[9]Indeed, the ALJ's finding of plaintiff's ability to sit "for up to two hours in an eight-hour day" (Tr. 15) is more restrictive than Dr. Allred's opinion that plaintiff could sit 1-2 hours at a time for a total of 3-4 hours per day (Tr. 679); even plaintiff estimated that he could sit for four out of eight hours (Tr. 123). No explanation is offered for this finding of plaintiff's limited ability to endure sitting.

17

Cox's assessments of plaintiff's capacity for standing/walking six out of eight hours, and for pushing/pulling/manipulating without restriction, were adopted and, in addition to the lifting and other postural, environmental, and reaching restrictions assessed by Dr. Allred, were found to allow for the performance of regular and continuing work activity at the light level of exertion.

While recognizing the "special significance" generally accorded the opinion of a treating physician (Tr. 17), the ALJ rendered this recognition hollow when he varied from the opinion of Dr. Allred without sufficiently explaining his reasons for doing so. Although, as defendant notes in its brief, mere diagnoses alone cannot provide sufficient support for an assessment of disabling limitations, unless other clinical evidence related to those diagnoses supports the severity of limitation assessed, see, e.g., Murphy v. Sec'y of Health & Human Servs., 801 F.2d 182, 185 (6th Cir. 1986), the ALJ failed to identify the evidentiary shortcomings of Dr. Allred's treatment notes which led him to conclude that plaintiff's combination of impairments did not limit him as Dr. Allred assessed. Moreover, the parsing of Dr. Allred's opinions with respect to the various work-related functions he assessed, with some receiving credence and others not, is not adequately explained either explicitly or implicitly by reference to particular evidence bearing on those functions. While the ALJ reasonably concluded that plaintiff's COPD alone would not prohibit light work and its attendant standing/walking/sitting requirements (Tr. 17), he otherwise left the court to guess as to his reasons for rejecting the standing/walking domain of Dr. Allred's assessment.[10] The

_____

[10]The assessment by Dr. Allred that plaintiff's ability to push and/or pull is "decreased" may be deemed reasonably rejected, and that rejection sufficiently supported, by the ALJ's explanation that "[t]he claimant retains good range of motion and strength in the right arm" (Tr. 18), a repetition

18

Sixth Circuit, in an unpublished decision cited in Bowen, supra, as helping to "outline [the] contours" of the harmless error exception to the § 1527(d)(2) requirement of good reason giving, has found fault with a similarly oblique ALJ decision, concluding that the courts' inability to discern the ALJ's reasons for rejecting certain portions of a treating physician's opinion necessitated remand. Hall v. Comm'r of Soc. Sec., 148 Fed.Appx. 456, 464-67 (6th Cir. Sept. 2, 2005). While the ALJ made reference almost in passing to plaintiff's reported daily activity level being consistent with the range of light work activity described by Dr. Cox (Tr. 18), the undersigned finds no support for this conclusion. As summarized by the ALJ, plaintiff's activities included doing some driving, light grocery shopping, performing some household chores, and taking care of his personal needs (Tr. 16). Either as described by the ALJ, or as described by plaintiff elsewhere in the record (Tr. 80-87), it is clear that plaintiff's level of daily activity is not inconsistent with his disability claim. See, e.g., Rogers, 486 F.3d at 248-49 & n.6.

Additionally, the ALJ's observation that Dr. Allred's "notes do not document chronic complaints of malaise," and that plaintiff's other subjective complaints are not sufficiently supported therein, appears to be short-sighted. There are numerous references to plaintiff's complaints of fatigue (even "profound fatigue"), being tired, not feeling good, having no energy, feeling bad or weak, etc., leading to the diagnosis of malaise in the notes of

---

of the findings of Dr. Cox (Tr. 704). However, even Dr. Cox noted plaintiff's history of neck pain related to degenerative joint disease, his prescription for the narcotic painkiller hydrocodone, and his complaint that the pain is aggravated by standing up for long periods of time, and presumably assessed a standing/walking restriction on the basis of this impairment (Tr. 701-05). For his part, Dr. Allred on examination appreciated "definite neck tenderness with decreased [range of motion]" in June 2005 (Tr. 687).

Dr. Allred from 1999 until at least 2004 (Tr. 370, 376, 378, 380, 391, 392, 395, 408, 412). These complaints often appear linked to plaintiff's chronic sinusitis and allergic rhinitis. Furthermore, there are several references in those notes to plaintiff's complaint of his head "swimming" or spinning and the corresponding diagnosis of vertigo, again frequently with acute sinusitis and/or bad headaches. (Tr. 373, 374, 376, 377, 389, 393, 398, 400) These complaints of fatigue and vertigo were regarded quite seriously by Dr. Allred, who prescribed Antivert for a period of time to combat the vertigo (Tr. 373-74), and who ordered tests of plaintiff's thyroid function, his sedimentation rate, and other blood work, as well as multiple scans of plaintiff's chest, sinuses, and cardiac processes (Tr. 424-545, 692-700), including a head and auditory canal MRI in response to plaintiff's complaints of headache and vertigo (Tr. 523). In June 2005, plaintiff's headaches were described as chronic, starting in the back of his neck, and thus presumably related to the inflammatory arthritis and resulting pain in the cervical region (Tr. 687). In short, while the objective tests ordered by Dr. Allred returned largely negative results, it is clear that the record supports at least the persistence with which plaintiff and his treating physician pursued the relief of such symptoms. Further administrative attention to these symptoms is warranted, particularly as they relate to the supportability of Dr. Allred's assessment. See 20 C.F.R. § 404.1527(d).

Finally, with regard to plaintiff's argument that he required an unacceptable number of work absences in order to have his recurring skin lesions removed, the ALJ disposed of this skin condition as a significant impairment by echoing plaintiff's hearing testimony that his "skin conditions require monitoring but do not impose limitations on his activities other than avoiding excessive sunlight." (Tr. 18; see Tr. 721) The government in

20

its brief treats the issue as moot because of plaintiff's testimony that, since the discontinuance of his TennCare coverage forced him to stop seeing his dermatologist in December 2004, he had simply been scratching the lesions off. (Tr. 725-26) The undersigned concludes that further development of this issue should be undertaken on remand, in light of the updated medical record.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**; that defendant's motion be **DENIED**; and that defendant's decision be **REVERSED** and the cause **REMANDED** for further administrative proceedings consistent with this report, to include rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 20th day of February, 2009.

         s/ John S. Bryant             
         JOHN S. BRYANT
         UNITED STATES MAGISTRATE JUDGE

Case 2:08-cv-00017   Document 23   Filed 02/20/09   Page 21 of 21 PageID #: 90